**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SUSAN E. GLOMSKI, Personal
Representative of the Estate of
WILLIAM L. GLOMSKI, JR.,
deceased,

              Plaintiff,                Case No. 05-70503

vs.                             **HONORABLE DENISE PAGE HOOD**

The COUNTY OF OAKLAND, Oakland
County Sheriff MICHAEL J. BOUCHARD,
DEPUTY LATONYA SMITH-MCCLELLAN,
DEPUTY ANTHONY VITTONE, DEPUTY
ARTHUR KINNEY, et al.[1],

              Defendants.

_____/

**MEMORANDUM OPINION AND ORDER**

## I.      INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment, filed on June

21, 2006.  Plaintiff filed a Response to Defendants' Motion for Summary Judgment on July 18,

2006.

This action brought pursuant to 42 U.S.C. § 1983, arises out of the circumstances

surrounding the death of William L. Glomski, Jr., while he was incarcerated at the Frank Grennan

Detention Facility (FGDF), the satellite office of the Oakland County Jail (OCJ), located in Pontiac,

Michigan.  Plaintiff is the Personal Representative of Decedent William Glomski.  In Plaintiff's First

---

[1] Plaintiff's First Amended Complaint also names "other unidentified Oakland County
Deputy/Sheriffs/Corrections Officers.

1

Amended Complaint, Plaintiff alleges that Defendants violated Decedent Glomski's Eighth, Fourteenth, and First Amendment rights.   Plaintiff asserts that Defendants retaliated against Decedent for writing a letter complaining about the OCJ's disciplinary actions by acting with deliberate indifference to Decedent's serious medical need to be transported for emergency medical attention when he began exhibiting seizure-like activity.   Plaintiff also alleges state law claims of assault, battery and gross negligence.   In their Motion for Summary Judgment, Defendants argue that Plaintiff has failed to establish that Decedent Glomski's constitutional rights were violated; cannot hold Defendant Sheriff Bouchard liable under a theory of respondeat superior; cannot hold the County of Oakland liable as there is no evidence of a policy or custom to infringe on Decedent's constitutional rights; and that Defendants are entitled to qualified and state law immunity.

## II.   STATEMENT OF FACTS

On or about May 25, 2004, Plaintiff's decedent, William Louis Glomski, Jr. began serving a sentence of 305 days for violating MICH. COMP. LAWS § 750.377a(b); willful and malicious destruction of property. (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 1)   Plaintiff was incarcerated at the Oakland County Jail's satellite facility, the Frank Grennan Detention Facility (FGDF).   This facility consists of two dorms, an east dorm and a west dorm.   (Defs.' Mot. for Summ. J., at 1)   During intake at the FGDF, Mr. Glomski, was provided a copy of the Corrective Services Inmate Guide. (*Id.*, Ex. 2)   Additionally, on June 8, 2004, Mr. Glomski was given a physical examination, memorialized on OCJ's Health History and Assessment form, which noted that Mr. Glomski had been assaulted in March 2004, and sustained severe injuries to his head and face requiring facial reconstructive surgery. (*Id.*, Ex. 3, Ex. 4, Susan Glomski Dep. Tr. at 17, 20)   Mr. Glomski's medical information was entered into the OCJ's computer system.   (*Id.*, Ex. 9)

2

On June 22, 2004, Mr. Glomski's entire dorm was locked down, or restricted to their bunks, due to an inmate's submission of an obscene kite.[2] (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 5, Ex. 6, Kurt Campbell Dep. Tr. at 31-33)    Mr. Glomski drafted a letter to jail administrators[3] regarding this incident, and requested that the jail follow its policy found in the Corrective Services Inmate Guide.[4]  (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 5)

On the morning of June 27, 2006, when the inmates were returning to their bunks after breakfast, at approximately 6:00 a.m., Mr. Glomski began exhibiting seizure-like symptoms.[5] He

---

[2]  A kite is a form utilized at the FGDF in order for inmates to communicate with the deputies.  (Pl.'s Resp. to Defs. Mot. for Summ. J., Ex. 19, Arthur Kinney Dep. Tr. at 169-70).

[3]  Mr. Glomski's letter was addressed to "Sheriff Bouchard, or Lieutenant, or Captain/Corrective Services."  (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 5)

[4]  The policy states in capital letters:

> At no time will groups of inmates be punished unless it is determined that all members in the group participated in the rule violation. (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 2).

[5]  There is a dispute as to the exact time Defendants became aware of Mr. Glomski's condition.   According to another inmate at FGDF who was housed in the same dorm, in a bunk a short distance away from Mr. Glomski's bunk, Mr. Glomski began to exhibit the above-mentioned symptoms around 6:00 a.m.  (Pl.'s  Resp. to Defs.' Mot. for Summ. J., Ex.8, Steven Drye Aff.). It should be noted that in Defendants' Reply Brief in Support of Defendants' Motion for Summary Judgment, Defendants assert that the affidavit of this inmate, Steven Drye, cannot be relied upon by this Court as it is an unsworn declaration.  Defendants are correct.  *See Pollock v. Pollock*, 154 F.3d 601, 612 (6th Cir. 1998)("An unsworn affidavit cannot be used to support or oppose a motion for summary judgment.")(Pl.'s  Resp. to Defs.' Mot. for Summ. J., Ex. 14). Plaintiff's counsel has since filed a notarized declaration from Mr. Drye.  The Court will therefore consider this Affidavit. (See Docket Entry 39)
It should be further noted that Defendants assert in their Reply Brief that Mr. Drye has no personal knowledge of this incident because he was moved from the east dorm to the west dorm sometime during the evening of June 26, 2004.  As such, Mr. Drye could not have witnessed any of what he attests to.  The Court notes that while Exhibit A indicates that Mr. Drye was transferred to the west dorm on June 26, 2004, Exhibit B states that he was moved on June 27, 2004.  If the latter is correct, then it is possible that Mr. Drye witnessed the events precipitating

3

2:05-cv-70503-DPH-MKM   Doc # 64   Filed 03/28/07   Pg 4 of 21   Pg ID 1215

could not speak, he was shaking, trembling and foaming at the mouth. (Pl.'s Resp. to Defs.' Mot. for Summ. J., Steven Drye Aff.) The inmates who witnessed this yelled for the deputies to get Mr. Glomski some medical attention. (*Id.*) Defendant Deputies Vittone and Kinney, were working that morning, and went to Mr. Glomski's bunk. (Defs. Mot. for Summ. J., Ex. B, Anthony Vittone Dep. Tr.) When they arrived, they observed Mr. Glomski laying on his stomach, bending his leg at the knee and thumping the mattress with his foot. (*Id.*) Defendant Kinney radioed for assistance after Mr. Glomski gave bizarre answers[6] to the Defendants' questions. (*Id.*) Defendant Vittone testified that Mr. Glomski "was saying things like he was retarded, he should be sent to the hole." (Dep. Tr. of Anthony Vittone, p. 52) Defendant Vittone further testified that he was worried that Mr. Glomski

---

Mr. Glomski's death at the FGDF. (*See* Defs.' Reply Brief in Support of Defs.' Mot. For Summ. J.)

       Defendants, Deputies Vittone, Kinney, and Smith-McClellan, testified that they were not aware of Mr. Glomski's condition until 6:30 a.m. (Defs.' Mot. for Summ. J., Ex. B, D, and F). However, Nurse Tipton, the nurse on duty that morning, placed in her notes that she received a call from Sergeant Smith-McClellan regarding Mr. Glomski between 6:00 a.m. and 6:15 a.m. At her deposition, Ms. Tipton indicated that she incorrectly put the time of between 6:00 and 6:15 a.m., as to when she received the call from Defendant Smith-McClellan. (Dep. Tr. of Nurse Deborah Tipton, p. 49, lns. 22-25) Ms. Tipton testified that the correct time was actually 6:45 a.m., which she memorialized on a Narrative Report she prepared two days after Mr. Glomski's death. (Dep. Tr. of Nurse Deborah Tipton, p.49, ln. 2, 14-16; p. 51, lns. 21-23) The Court finds that the actual time that Defendant-Deputies became aware of Mr. Glomski's condition is a fact in dispute.

      [6] Defendant Vittone described it as "an odd thing to say" when Mr. Glomski stated that he was exercising when Defendant Vittone asked him what the problem was. (Dep. Tr. of Anthony Vittone). Defendant Kinney testified that Mr. Glomski asked him if he wanted to have an arm wrestling contest with him. (Dep. Tr. of Arthur Kinney, p. 103) Defendant Kinney further testified that Mr. Glomski gave "odd replies" to questions,

> It was just like when he asked me about arm wrestling, there was no sense in asking me if I wanted to arm wrestle. That's what I am saying. They were odd questions that he was speaking of.

(*Id.* p. 105)

would fall out of his bunk, so he decided to secure him by grabbing his left leg and his uniform shirt in order to prevent Mr. Glomski from rolling out of bed. (*Id.* at p. 42-43).

The supervisor on duty that morning, Deputy Smith-McClellan,[7] arrived and asked Mr. Glomski some additional questions. (*Id.*) According to Defendant Vittone, Mr. Glomski's responses were understandable, and he appeared to be lucid and coherent. (*Id.* at 48) However, Defendant Smith-McClellan testified at her deposition that Mr. Glomski was "incoherent" because "his statements didn't make sense to me." (Pl.'s Mot. for Summ. J., Ex. 11) Defendant Smith-McClellan proceeded to check Mr. Glomski's medical information on the computer medical screen to see if any medical alerts were listed. (*Id.*) After determining that Mr. Glomski had no medical alerts, she called the nurse on duty, Deborah Tipton, R.N.,[8] informing her that Mr. Glomski "appeared to have had a seizure and that he was incoherent and twitching in his bunk." (*Id.*) The nurse stated that since Mr. Glomski was able to converse with the deputies, it was unlikely that he was having a seizure, she told Defendant Smith-McClellan that he could "have had some psych issues or that he could be faking" and suggested that Defendant Smith-McClellan administer an ammonia inhalant to Decedent Glomski "to see if he would respond to" it. (*Id.*) As soon as Defendant Smith-McClellan administered this inhalant to Mr. Glomski, "he threw up what appeared to be cereal; and light green mucous came from his nose."[9] (*Id.*) Defendant Smith-McClellan called

---

[7] Defendant Smith-McClellan has been promoted to Sergeant.

[8] The FGDF has a nurse on site, Monday through Friday, during the day shift only. Ms. Tipton was at the OCJ's main facility.

[9] Mr. Drye, states that after the ammonia inhalant was administered to Mr. Glomski, all three deputies left the room, before doing so, one of them placed handcuffs around Mr. Glomski's left ankle and secured it to the bunk. Mr. Drye further alleges that Mr. Glomski was left unattended for 45 minutes before any of the deputies returned to assist him. (Aff. of Steven Drye)

5

the nurse again to inform her of what happened after the ammonia inhalant was administered. (*Id.*).
The nurse then suggested that Defendants transport Mr. Glomski to the main jail for assessment.
(Pl.'s Mot. for Summ. J., Ex. 14)

According to Defendants, Mr. Glomski was uncooperative when Defendants Vittone and
Kinney attempted to handcuff him.  Defendant Vittone testified that "he wouldn't respond to verbal
commands to give us his arms.  We had to pull his arms out from underneath him." (Dep. Tr. of
Anthony Vittone, p. 63)  Mr. Glomski was escorted to the transport van.[10]  Defendant Kinney and
Smith-McClellan took Mr. Glomski to the main jail clinic at the Oakland County Jail.  (Dep. Tr. of
Arthur Kinney, p. 134)  According to another nurse's report, Nurse Lopez, the Defendants who
transported Mr. Glomski stated that he was uncooperative and combative during his transfer to the
main jail.  (*Id.*, Ex. 13)  However, according to this nurse's report, Mr. Glomski was carried into the
main jail and was nonresponsive.  (*Id., See also* Nurse Tipton's report; *See also* Pl.'s Resp. to Defs.'
Mot. for Summ. J., Ex. 14 )

---

[10]  There is a factual dispute as to whether Mr. Glomski was able to walk out of the
facility on his own.  Defendant Smith-McClellan testified that two officers, on either side of Mr.
Glomski, escorted him to the van, and that his feet were on the floor, and he appeared to be able
to support himself.  (Dep. Tr. of LaTonya Smith-McClellan, pgs. 235-36) Defendant Kinney
testified that Mr. Glomski was physically carried out to the van by three officers and that he was
placed in the van.  (Dep. Tr. of Arthur Kinney)

Mr. Drye stated that:

By the time that Mr. Glomski was physically removed from the bunk, he was
totally unresponsive.  The deputies dropped his feet on the floor, as they were
attempting to remove him from the top bunk.  Mr. Glomski was then half carried
and half dragged out of the squad bay by the deputies.

(Aff. of Steven Drye)

6

After assessing Mr. Glomski's condition, Nurse Lopez notified OCSD to call for advanced life support, which arrived and took Mr. Glomski to the emergency room of North Oakland Medical Center at 7:45 a.m. (*Id.*). At the time of his arrival at North Oakland Medical Center, Mr. Glomski was beyond medical intervention because he had suffered a significant intercerebral hemorrhage. (Pl.'s Resp. to Defs.' Mot. for Summ. J., p. 9) Mr. Glomski's family kept him alive for a day in an attempt to donate some of his organs. (*Id.*)

## III.   APPLICABLE LAW

### A.  Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry to summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has
the burden of proof.

To create a genuine issue of material fact, the nonmovant must do more than present "some evidence" of a disputed fact. "If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Accordingly, a nonmovant "must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact." *Mathieu v. Chun*, 828 F. Supp. 495, 497 (E.D. Mich. 1993) (citations omitted).

### B.      Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment requires that prison officials provide humane conditions of confinement, which includes providing inmates' access to medical care. *Farmer v. Brennan*, 511 U.S. 825, 833, 128 L.Ed. 2d 811, 114 S. Ct. 1861 (1994). The Eighth Amendment is violated when jail officials are deliberately indifferent to an inmate's serious medical needs. *Id.* at 834, *Estelle v. Gamble*, 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S.Ct. 285 (1976).

To state a § 1983 claim based upon a denial of medical care, the plaintiff is required to demonstrate a subjective component and an objective component. *Farmer v. Brennan*, 511 U.S. 825, 834, 128 L.Ed. 2d 811, 114 S. Ct. 1861 (1994); *Brown v. Bargery*, 207 F. 3d 863, 867 (6th Cir. 2000).

To establish the subjective component, Plaintiff must demonstrate that each Defendant possessed a "sufficiently culpable state of mind." *Farmer, 511 U.S.* at 834; *Blackmore v. Kalamazoo County*, 390 F. 3d 890, 895 (6th Cir. 2004). The defendant "must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must

8

also draw the inference." *Blackmore,* 390 F. 3d at 896(quoting *Farmer*, 511 U.S. at 837). A "sufficiently culpable state of mind" is demonstrated when prison officials act with deliberate indifference to an inmate's serious medical needs. *Farmer,* 511 U.S. at 834. Intentionally delaying or denying an inmate, who is suffering from a serious medical illness, access to medical care is deliberate indifference. *Estelle*, 429 U.S. at 104-05. Mere negligence is insufficient to establish the existence of the requisite mental state. *Blackmore*, 390 F. 3d at 895-96. Conversely, proof that the prison official intended the harm to occur, or knew that harm would most likely result is not required to establish that the official acted with deliberate indifference. *Id.*

In order to establish the objective component, a plaintiff must demonstrate a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834; *Blackmore*, 390 F. 3d at 895. The plaintiff need not demonstrate that his illness worsened due to the delay in medical treatment, where the "illness is so obvious that even a layperson would easily recognize the necessity for a doctor's attention . . . ." *Blackmore*, 390  F. 3d at 899- 900.  A plaintiff need only to establish that "he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame*." Id.*

Defendants appear to concede that Mr. Glomski possessed a sufficiently serious medical need as they do not address this issue in their Motion for Summary Judgment. Defendants argue that Plaintiff cannot demonstrate the requisite subjective component  because Defendants promptly provided Mr. Glomski assistance and, in any event, they did not believe that Mr. Glomski was having a seizure or know about Mr. Glomski's prior head injury.

9

The Court finds that there is a factual dispute as to whether Defendants possessed the requisite culpable state of mind. Oakland County Jail's policy on emergency services[11] lists examples of emergency conditions, one of which is "onset of bizarre behavior." (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 12) There is evidence in the record indicating that Mr. Glomski was exhibiting bizarre behavior. Defendants Vittone and Smith-McClellan both testified that he was exhibiting odd behavior because his responses to questions were strange. Additionally, Defendants Vittone and Kinney were both concerned that he would fall off of his bunk so both physically restrained him. There is some evidence that at the point he was taken for transport, he was completely unresponsive and could not walk out of the building without the Defendants' assistance.[12] Further, the administration of the ammonia inhalant suggests that Mr. Glomski was unresponsive, as Nurse Deborah Tipton suggested that Mr. Glomski be given the inhalant "to see if he responds." (Dep. Tr. of LaTonya Smith-McClellan, p. 206) Additionally, when Defendants transported him to the main jail for observation, it appears that he was completely unconscious, as he was carried into main jail, taken to the K-pod and placed on the floor. Since there is a factual dispute regarding whether Mr. Glomski's symptoms would have put Defendants on notice that a substantial risk of serious harm to Mr. Glomski was likely and therefore whether Defendants were deliberately indifferent to his need for emergency medical attention, summary judgment on this issue is not appropriate. Further, the Court notes that Plaintiff is not required to demonstrate that if Mr.

_____

[11] It should be noted that "seizures" and "unconsciousness" are among the conditions listed. The policy also instructs that ""[s]hould health care personnel not be available on site, corrective services personnel should transport the inmate to an emergency facility if there is any question an inmate needs emergency care." (*Id.*, p. 3)

[12] Nurse Lopez indicated in her report that according to the transporting officers, Mr. Glomski was exhibiting "bizarre" behavior. (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 13)

10

Glomski had received immediate medical attention, his death would not have occurred.  *See Blackmore*, 390  F. 3d at 899- 900.

### 1.      Qualified Immunity

Defendants argue that even if Mr. Glomski's Eighth Amendment rights were violated, Defendants are entitled to qualified immunity because their actions were not objectively unreasonable.

Qualified immunity is generally a threshold defense whose applicability is to be determined by the trial judge.  *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988).  Governmental officials are entitled to qualified immunity when their discretionary acts do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992).  The Supreme Court has set forth a two-part test to determine whether qualified immunity should attach.  First, the court must decide whether, in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 121 (2001).  If there is no such violation, the inquiry ends here.  *Id*.  If a violation can be adequately stated, the court next asks whether the right was clearly established.  *Id*.  Providing guidance in determining whether a right was clearly established, the Court stated, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable offic[ial] that his conduct was unlawful in the situation he confronted**."** *Id*.  *Saucier* also provides that an official's reasonable mistake is still cloaked with immunity.  *Id*.  Plaintiff must show that the officers violated a right so clearly established that any official in Defendants' positions would have understood that they were under an affirmative duty to refrain from such conduct. *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir.

11

1988), *cert. denied*, 488 U.S. 1007 (1989). In other words, Plaintiff must demonstrate that Defendants' conduct was objectively unreasonable in light of Plaintiff's clearly established rights. *See Williams v. Mehra*, 186 F. 3d 685, 691 (6th Cir. 1999).

For over thirty years, it has been clearly established that an inmate's Eighth Amendment rights are violated when jail officials are deliberately indifferent to his or her serious medical needs. *See Estelle,* 429 U.S. at 104.  There is a factual dispute as to whether Defendants' conduct in failing to promptly call for emergency medical attention was objectively unreasonable in light of Mr. Glomski's condition and the OCJ policy on emergency medical services.  Defendants are not entitled to qualified immunity.

Defendants' Motion for Summary Judgment on this issue is DENIED.

## C.     Fourteenth Amendment

### 1.     Due Process

The Due Process clause of the Fourteenth Amendment prohibits states from "depriving any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV. Defendants are correct in stating that Plaintiff's Due Process claim mirrors his Eighth Amendment claim.  Defendants further assert that Plaintiff cannot demonstrate Defendants' actions were "an abuse of executive power that shocks the conscience."  *See Ewolski v. City of Brunswick*, 287 F. 3d 492, 509 (6th Cir. 2002).  The Court need not address this argument as Plaintiff will obtain  redress under the Eighth Amendment.  *See  Walker v. Norris*, 917 F 2d 1449, 1455 (6th Cir. 1990). The Supreme Court has stated that "[t]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners . . . ." *Whitley v. Albers*, 475 U.S. 312, 327, 106 S. Ct.

12

1078, 89 L. Ed. 2d 251 (1986).  As such, Plaintiff's due process claim is dismissed, and Defendants'

Motion for Summary Judgment on this issue is GRANTED.

### 2.      Equal Protection

Defendants argue that Plaintiff's equal protection claim must fail because he has not

demonstrated how Defendants treated Plaintiff differently than similarly situated individuals.  *See*

*Silver v. Franklin Township, Board of Zoning Appeals*, 966 F. 2d 1031, 1036 (6th Cir. 1992).  The

Court agrees.  Plaintiff argues that he did not receive the treatment that other inmates received or

would have received had Defendants followed the OCJ's emergency services policy.  Plaintiff does

not present any evidence of similarly situated individuals who received prompt emergency care.

Without this evidence, there is no genuine issue of material fact as to whether Plaintiff's rights were

violated under the Equal Protection Clause of the Fourteenth Amendment.  As such, Defendants'

Motion for Summary Judgment on this issue is GRANTED.

### D.      First Amendment

It is Plaintiff's contention that Defendants failed to provide emergency care to Mr. Glomski

in retaliation for Mr. Glomski's earlier letter regarding the lock down on June 22, 2004, and this is

a violation of Plaintiff's First Amendment right to access the courts.  Inmates have a right to access

the courts under the First Amendment.  *Bounds v. Smith*, 430 U.S. 817, 822, 97 S. Ct. 1491, 52 L.

Ed. 2d 72 (1977).   "An inmate has an undisputed First Amendment right to file grievances against

prison officials on his own behalf" as long as the grievances are non-frivolous.  *Herron v. Harrison*,

203 F.  3d 410, 415 (6th Cir. 2000).  In order for Plaintiff to establish a retaliation claim under the

First Amendment, he must show that 1) he was engaged in protected conduct, 2) an adverse action

was taken against Plaintiff for engaging in this protected conduct that would deter a person of

ordinary firmness from continuing to engage in such conduct and 3) there is a causal connection between the adverse action and Plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F. 3d 378, 394 (6th Cir. 1999)**.**

Plaintiff's letter to Defendant Bouchard and other jail administrators was a grievance. Denying an inmate access to emergency medical care when he needs it because of his or her previous grievance (the letter) would deter a person of ordinary firmness from filing additional grievances.

Defendants argue that Plaintiff cannot establish the third element for his retaliation claim, specifically that Defendants were aware of Plaintiff's decedent's letter regarding the lock down of the east dorm on June 22, 2004. All of the Defendants testified at their depositions that they did not know Mr. Glomski, even though he had been at the jail since May 25, 2004. They also claim they were unaware of both the June 22, 2004 lock down and Mr. Glomski's letter regarding this incident. Plaintiff counters that Defendants had possession of the letter as it was returned to Plaintiff's parents when they picked up his personal belongings at the jail after his death. Further, Plaintiff argues that Mr. Glomski informed her that he had submitted the letter to jail administrators. This is insufficient to withstand summary judgment. There is simply no evidence that Defendants were aware of Mr. Glomski's letter. Although Mr. Glomski's parents were given the letter along with his other personal belongings after his death, this does not necessarily prove that Defendants had possession and knowledge of it on June 27, 2004. Further, the fact that it was handed over with the rest of his belongings suggests that it was taken from his cell and, consequently, it is unlikely that it was ever

14

sent to Defendant Bouchard.[13]  As Plaintiff cannot demonstrate the causal connection between the protected conduct and the retaliatory action, summary judgment on this claim is warranted and this claim is dismissed.   Defendants' Motion for Summary Judgment on Plaintiff's First Amendment claim is GRANTED.

  **E.**  **Municipal Liability**

  Plaintiff alleges that Defendant County of Oakland had policies, practices and customs that amounted to liability under section 1983.   Plaintiff also alleges that Defendant County of Oakland failed to train its officers on how to properly respond to an inmate's serious medical needs. To establish municipal liability, a plaintiff first must establish that a constitutional violation has occurred.  *Lewellen v. Metropolitan Gov't of Nashville and Davidson County, Tennessee*, 34 F.3d 345, 350 (6th Cir. 1994).   After this is established, a municipality will be liable if the constitutional violation was a result of the municipality's custom or policy.  *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 56 L. Ed.2d 611, 98 S. Ct. 2018 (1978).   Liability can also be premised on a municipality's or county's failure to train its officers which "amounts to deliberate indifference toward a[n inmate's] serious medical needs." *Blackmore*, 390 F. 3d at 901.   In *Blackmore*, the Sixth Circuit  reversed the district court's grant of summary judgment for the County of Kalamazoo because the record demonstrated that the County had no written, formal policy regarding how to provide adequate medical care to inmates suffering from obvious, serious medical illnesses.  *Id.*

  Deputy Vittone testified at his deposition that FGDF had no written policy, only an oral policy.  Defendant Vittone described the policy:

---

  [13]  It is unclear whether Defendant Bouchard was ever deposed and asked whether or not he had knowledge of Mr. Glomski's letter.

> The policy was that we would secure the area. Outside of something that was very obvious, the supervisor would be notified; and then we would make every effort to contact the clinic.

He further testified that only the Oakland County's main jail had a written policy on how to deal with medical emergencies, but that he had never seen the written policy before his attorney provided him a copy for purposes of his deposition.[14]   Further, Nurse Tipton, R.N. testified that prompt diagnosis of a stroke was very important because "[t]hey have injections they can give you so it doesn't go into a life-threatening stroke . . . ." (Dep. Tr. of Nurse Deborah Tipton, R.N., p. 158) It appears from the record that the deputies were not trained or informed of this fact. Since the OCJ does not staff the FGDF 24 hours a day, 7 days a week with at least one medically trained individual, it is question of fact as to whether this is deliberate indifference to inmates' serious medical needs. Accordingly, there is a question of fact as to whether the County of Oakland's failure to train its officers on how to properly respond to an inmate's obvious, medical emergency demonstrates that the County was deliberately indifferent to its inmates' serious medical needs. There is also a question of fact as to whether the County of Oakland had a policy or custom of deliberate indifference to inmates' serious medical needs. Defendants' Motion for Summary Judgment on this issue is DENIED.

## F.    Respondeat Superior

Defendants assert that Defendant Bouchard as Sheriff of Oakland County cannot be held liable because Plaintiff's claim is one for respondeat superior liability and such claims are unsustainable under § 1983 unless there is proof that the supervisor "either encouraged the specific

---

[14]   It is unclear how this oral policy was provided to the deputies, that is, when and who informed the deputies of the jail's policy.

16

incident of misconduct or in some other way directly participated in it." *See Comstock v. McCrary*, 273 F. 3d 693, 712-13 (6th Cir. 2001).  Defendants argue that since there are no allegations that Defendant Bouchard was aware of or otherwise directly participated in the events precipitating the death of Mr. Glomski, that Defendant Bouchard must be dismissed.  However, if the Plaintiff can demonstrate that Defendant Bouchard either "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct" of Defendants Vittone, Smith-McClellan, and Kinney then Defendant Bouchard can be liable under §1983.

Plaintiff contends that Defendant Bouchard's failure to investigate and discipline the Defendant-Deputies demonstrates that Defendant Bouchard "knowingly acquiesced" in the unconstitutional conduct of the Defendant Deputies in failing to promptly get emergency medical attention for Mr. Glomski.[15] Taking Plaintiff's allegation that  Defendant Bouchard failed to do so as true, then Plaintiff  has stated a general issue of material fact as to whether this failure amounted to a policy of deliberate indifference to Mr. Glomski's emergency medical care needs. A policy of deliberate indifference based upon a sheriff's failure to investigate and discipline officers engaged in unconstitutional conduct has been recognized by the Sixth Circuit as "ratification of the illegal acts" of such officers.  *See Marchese v. Lucas*, 758 F. 2d 181, 188 (6th Cir. 1985); *Leach v. Shelby County Sheriff*, 891 F. 2d 1241, 1247 (6th Cir. 1989).  Accordingly, Defendant Bouchard's failure to investigate Mr. Glomski's death and either revise the policy on emergency medical attention or

---

[15]  No evidence has been submitted regarding whether or not Defendant Bouchard investigated either Mr. Glomski's death, or reviewed the jail's policy regarding emergency medical treatment for inmates to ascertain whether a revised policy or more training was needed. Nurse Deborah Tipton testified that she was informally questioned about the events of June 27, 2004.  She further testified that she was never disciplined.  (Dep. Tr. of Deborah Tipton, R.N., p. 44)

punish the Defendant Deputies may demonstrate an official policy of deliberate indifference to the serious medical needs of prisoners. *Leach*, 891 F. 2d at 1247. Summary Judgment on this issue in favor of Defendant Bouchard is therefore inappropriate and is DENIED.

### H.    State Law Claims

Plaintiff has also asserted state law claims of gross negligence and assault and battery. Defendants assert that Defendant Bouchard is immune from tort liability pursuant to

MICH. COMP. LAWS § 691.1407(5), which states:

> Judges, legislators, and the elective or highest appointive executive officials of all levels of government are immune from tort liability for injuries to persons or damages to property whenever they are acting within the scope of their judicial, legislative, or executive authority.

MICH. COMP. LAWS § 691.1407(5)**.** Defendant Bouchard was elected as Oakland County's Sheriff. Defendants are correct that he is immune from liability under Michigan's statute. *See HRSS, Inc. v. Wayne County Treasurer*, 279 F. Supp. 2d 846 (E.D. Mich. 2003). As such, Plaintiff's state law claims of gross negligence and assault and battery against Defendant Bouchard are dismissed.

### 1.    Gross Negligence

Michigan's governmental tort liability act, MICH. COMP. LAWS § § 691.1401 *et seq.* grants broad immunity. An exception exists where the governmental employee was grossly negligent and this conduct is the proximate cause of the injury. *See* MICH. COMP. LAWS § 691.1407 (2)(c). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* There is a factual dispute as to whether Defendants Kinney, Vittone, and Smith-McClellan were grossly negligent in failing to get prompt medical care for Mr. Glomski. Defendants argue that Plaintiff cannot prove that their conduct was the proximate cause or "most immediate, efficient and direct cause of the injury or damage . . . ." *Robinson v. City of Detroit*, 462

Mich 39, 613 NW2d 307 (2000). Defendants rely on Mr. Glomski's autopsy report which indicated that the cause of death was an "intercerebral hemorrhage due to hypertensive cardiovascular disease." (Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 10). Defendants argue that they did not cause Mr. Glomski's intercerebral hemorrhage, and that Plaintiff cannot demonstrate their actions were the proximate cause of his injury. Plaintiff counters that Defendants' reliance on *Robinson* is misplaced as this case's discussion of proximate cause goes to the issue of damages. Plaintiff is incorrect. The express language of the statute requires that the employee's gross negligence be the proximate cause of the injury. *See* MICH. COMP. LAWS § 691.1407(2)(c). Defendants' argument that they did not cause Mr. Glomski's intercerebral hemorrhage does not accurately reflect the issue however, the issue is whether Defendants' delay in providing Mr. Glomski with emergency medical care was the direct cause of Mr. Glomski's death. As such, Plaintiff must present evidence that if Mr. Glomski was promptly transported for emergency care, he would not have died from the intercerebral hemorrhage. Plaintiff has presented some evidence indicating that if Defendants had promptly called for EMS, that Mr. Glomski would not have died. Nurse Tipton testified that if prompt medical intervention, that is if injections had been administered, that a life-threatening situation, and Mr. Glomski's, death could have been avoided. As such, dismissal of this claim is unwarranted. Defendants' Motion for Summary Judgment is DENIED on this issue.

### 2.     Assault and Battery

Plaintiff claims that Defendants committed assault and battery when they handcuffed his ankles to the bunk, as well as by administering the ammonia inhalant to Mr. Glomski. It is well established that there is no governmental immunity exception for intentional tort claims against government agencies. *Smith v. Dep't of Public Health*, 428 Mich. 540, 544; 410 NW2d 749 (1987).

19

In order for Defendants to be liable for assault,  Plaintiff must demonstrate that 1) Defendants intended to inflict a harmful or an offensive contact upon Mr. Glomski or that Defendants intended to put Mr. Glomski in apprehension of such contact and 2) Mr. Glomski was thereby put in imminent apprehension of such contact and 3) Defendants had the apparent present ability to accomplish the contact .  *See Mitchell v. Daly*, 133 Mich. App. 414, 426-27; 350 N.W. 2d 772 (1984) and *Smith v. Stolberg*, 231 Mich. App. 256, 260; 586 N.W. 2d 103 (1998).  In order for Plaintiff to demonstrate that Defendants committed battery, Plaintiff must demonstrate that Defendants committed 1) a wilful and harmful or offensive touching of Mr. Glomski's person and 2) Defendants intended to cause such contact.  *See Smith*, 133 Mich. App. at 260.

Defendants argue that there is no evidence to support Plaintiff's assault and battery claim because Plaintiff's left ankle was never handcuffed and no objects were forced into his mouth. Plaintiff argues that there is evidence that his ankles were handcuffed to his bunk because Nurse Lopez's report indicates that Mr. Glomski had bruising on his ankles.  Additionally, Plaintiff argues that it was also an assault and battery when Defendant Smith-McClellan administered the ammonia solution to Mr. Glomski.

The Court finds that there is a question of fact as to whether Defendants committed assault and battery on Mr. Glomski.  Plaintiff and Defendants have conflicting stories regarding the handcuffing of Mr. Glomski's ankles.  While Plaintiff has not demonstrated that Mr. Glomski was in apprehension of an imminent contact, this is a question of fact for the jury to decide.

**IV.     CONCLUSION**

Accordingly,

20

IT IS ORDERED that Defendants' Motion for Summary Judgment **[Docket No. 33, filed July 21, 2006]** is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's First Amendment claim and Fourteenth Amendment Due Process and Equal Protection claims.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's state law claims against Defendant Bouchard.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Eighth Amendment claim.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's claims asserted under §1983 against the County of Oakland and Defendant Bouchard.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's state law claims of gross negligence and assault and battery against Defendants Smith-McClellan, Vittone, and Kinney.

Dated:  March 28, 2007                                   /S/ DENISE PAGE HOOD
Detroit, Michigan                                        UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was served upon counsel of record on March 28, 2007, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager